We are ready for argument in our first case, Mendoza v. Sessions. Ms. Parsonage? Judge Duncan, and may it please the Court, my name is Helen Parsonage and I represent the petitioner Felipe de Jesus Molina Mendoza in this matter. The issue before the Court today is whether substantial evidence supported the agency's denial of asylum for my client based on his fear for future persecution. Certainly the standard is very deferential to the agency. However, that deference is not absolute or without bounds. This Court in three key cases over the last decade now, starting with Baharan v. Holder in 2009 and then with Huipan v. Holder in 2013 and Ai Hua Chen v. Holder in 2014, has set out very clear limits on the discretion that will be given to the agency when there is evidence from the decision that the agency selectively viewed evidence in the record or mischaracterized evidence in the record. Ms. Parsonage, what is before us on appeal? What is properly before us? Whether the agency's ruling is, I'm sorry, it's a review of the Board's upholding of the denial of the asylum by the immigration judge. It was basically a summary affirmance, a very short affirmance by the Board of Immigration Appeals. So the Court is reviewing the immigration judge's written decision in this case. What are the issues before us? The issue is that the standard of review that this Court will apply in reviewing an agency's denial of asylum. I thought the standard of review is decided by law. What are the issues that you're arguing this morning? The issue that I'm arguing is that the immigration judge both selectively picked parts of the record and that the immigration judge mischaracterized parts of the record in order to reach the conclusion that he did. Let me be more specific. Are you arguing, are you arguing, do you wish to argue past persecution or well-founded fear of future persecution or both? Thank you for the clarification, Your Honor. I believe that in the question of past persecution, there are some problems there with the judge's cherry-picking of the evidence, so I would not concede that past persecution is not there. But future persecution is the issue that this Court specifically asked in the call of the appeal. Right. And the reason that I asked you that is that I don't, it is not, it does not appear to me that the past persecution claim is before us because I don't believe Mendoza raised that challenge before the Board and therefore did not exhaust his administrative remedies. Do you take issue with that? No, Your Honor. So in fact, the only issue, and because there is no, the issue of past persecution is not before us, that redefines the issue that we have, what we have to decide with respect to, there's no presumption of a well-founded fear of future persecution. Correct? Correct. In that instance, there is no presumption, Your Honor. May I ask you, Ms. Gipson, about your cherry-picking argument? I note Ai Wai-Chen may be particularly relevant in this case, but I also note you didn't argue it in your opening brief. Ai Wai-Chen isn't even cited, and the argument you're making today is distinctly different than the one in your pleadings. What do we do with that? I don't believe it is, Your Honor. We have argued all the way through that the evidence supports a well-founded fear of persecution. You know, I don't think there's any argument, you know. But the Ai Wai-Chen argument specifically, as I understand it, is that when the IJ or the BIA takes, as you put it, cherry-picks, takes selective evidence and doesn't consider the record evidence as a whole as they are, quote, required to do, as this Court has said, that the problem is really one of the BIA and the IAG was insufficient in its explanation and its reasoning. That argument I didn't see specifically in your pleading, but does that matter? I don't think it does, Your Honor, because the argument that we made and have made throughout is that the evidence does not support the judge's decisions. And if I may, I would like to give a couple examples, very specific examples of the cherry-picking that we see, one of which does apply to past persecution, but I think it's indicative of that. When discussing past persecution, which is relevant only to the extent that it supports a well-founded fear of future persecution, we're not asking for the presumption, but it supports his past experience, supports the subjective and objective reasonableness of his well-founded fear of future persecution. And the immigration judge characterized the threats that my client had experienced as incidental, tangential, superficial, or subordinate to attempts to intimidate him in some unspecified way. The record simply doesn't support that because throughout my client's sworn statements, every incident of threat or persecution in his past is accompanied by very specific details of the basis of that persecution. In his sworn statement for his credible fear interview, administrative record 521 at SEC, and in his sworn statement submitted to the immigration court about page administrative record 258 at SEC, every single one is accompanied by descriptions of epithets, which I will not repeat here, but which are in the record, which make it really clear what the basis of the threat and the discrimination was. It is certainly true that Mendoza was subjected to epithets, if you will. The police did not take his claims seriously. They did not seem particularly predisposed to help him. What we have to show, though, is that the record compels a different conclusion here, do we not? So what is your basis in support of that argument? My basis in support of that argument turns on the future persecution. In the immigration judge's decision, he acknowledged a large amount of evidence that was submitted showing that the Mexican government is unable or unwilling to prevent attacks and homophobia in Mexico. He acknowledged, for example, that discrimination based on sexual orientation and gender identity is prevalent. There is still stigma and prejudice. The government doesn't always investigate and punish those complicit in abuses. He acknowledged reports that advancement in gay rights in Mexico's capital conceal an ugly problem, which is unchecked discrimination and violence. The record also contains evidence that the Mexican government is committed to ending discrimination against homosexual individuals. One of the sources quoted by the immigration court noted that Mexico is to be applauded for having taken positive steps in recent years to amend its constitution and to enact federal legislation prohibiting discrimination on the basis of sexual orientation. It was one of the first Latin American jurisdictions to legalize same-sex marriages. And police officers in Mexico City are required to participate in training designed to sensitize them to issues of intolerance toward the gay community. You are quite right that there is evidence that discrimination on the basis of homosexuality continues, but that evidence is at best equivocal. At least in that it is responded to by specific evidence in the record of the steps that Mexico is taking to combat that intolerance. At best it would seem that the evidence is conflicting or in equipoise. I would respectfully disagree that it is in equipoise, Your Honor. There was significant evidence submitted that the fact of passing of legislation has had little to no effect on the daily life of gay folks in Mexico. Isn't it somewhat oversimplifying the issue to say that all LGBT individuals are treated the same in all parts of Mexico? One problem that I have with the evidence compelling a finding other than what the IJ found was that the evidence you produced was sometimes specific to geography, sometimes specific to a particular event, and no evidence connecting in a concrete way, as the IJ determined, the petitioner to the particular ills that are still in pockets of Mexico. What can you point us to that is contrary to the way that I just described the record? Well, I think that one way to view that is to view those as part of a pattern and practice type of evidence. Well, the problem, though, I think, as Judge Zinis' questions indicate, is that we can't necessarily extrapolate, in fact, we can't extrapolate, given our standard of review, from the pockets to the systemic. I understand, Your Honor. I think that, I mean, it's pretty clear. A significant part of the documentation actually refers to Mexico City, which is the home territory for my client. And, you know, Mexico City is held up as the most liberal of them all, and yet there was significant evidence submitted still that Mexico City, as it says, the liberalization of the law hides an ugly underbelly. In your theory of the case, Ms. Parsonage, would it be the result that so long as an individual could show some pattern of abuse individually, and then your reliance on these reports, that each and every individual to come before the immigration court would necessarily make out a claim just by name? The conclusion being that the discrimination is so pervasive that there simply is no place where a gay Mexican national could go and be safe. Is that your theory in this case? In a nutshell, yes, Your Honor, because, as I say, the evidence shows that the one place in Mexico where gay men are supposed to be safest is still a really dangerous place where the police are not investigating claims. And I think where the agency really erred here is in placing so much reliance on statutory reform. And I know that this case came out since the board made the decision, but the Ninth Circuit case in Bringas-Rodriguez, I think, is really instructive on this. And the judges in that case put it much better than I did. It says Mexico is to be lauded for its efforts, but it's well recognized that a country's laws are not always reflective of actual country conditions. It's not unusual that a country's de jure commitments to LGBTI protection do not align with the de facto reality of whether the state is able and willing to provide protection. You know, even in the United States, we are aware of the fact that legislation does not end discrimination. But you would say that the opposing side wants to receive an A for effort when the reality on the ground is something entirely different. Yes, and I don't think an A for effort is sufficient to overcome a well-founded fear for future persecution. Let me ask you about something else in this record, which is troubling to me. The IJ relied on a State Department report. And he used this language in the record for the proposition that, quote, ending discrimination and violence against minorities, including members of the LGBT community, remains a high priority for governmental and non-governmental actors. As I understand it, the report says no such thing. That's correct, Your Honor. I think it's another example of the kind of cherry-picking, to a borrowed phrase from the credibility cases, that we have a serious problem with. Even the country reports say that there continue to be problems. I think the IJ simply determined that actors in Mexico are taking sincere and practical steps to combat violence, and apparently that is sufficient to overcome my client's objectively well-founded fear of persecution. I would contend that that is not sufficient, given the bulk of the evidence to the contrary, that discrimination still continues in a very serious way, including by police officers, not just with the complicity of police officers, as shown in the record. And I see that I am out of time. I reserve my five minutes. Thank you very much. You did indeed. Thank you very much. Ms. Smith? Good morning, Your Honors. May it please the Court, Katherine Smith for the respondent. This record does not compel a finding that Petitioner 1 demonstrated harm rising to the severity of past persecution. Is past persecution before us? I'm not entirely certain, Your Honor, because the Board did briefly address past persecution and upheld the immigration judge's finding, but Petitioner – Was it presented to the immigration judge? It was not. It was presented to the immigration judge, but not the Board, Your Honor. Not the Board. And the Board, therefore, only addressed the 2012 and 2013 incidents of street harassment that made up Petitioner's claim before the immigration judge. So to the extent that Petitioner now wants to morph his claim into one about childhood abuse, that is definitely not before this Court, because it's completely unexhausted. To the extent the Court does consider the issue of past persecution, the three incidents of street harassment that Petitioner experienced in 2012 and 2013, while offensive, do not contain the requisite severity to qualify as past persecution that would give him a reputable presumption of a well-founded fear. So in the absence – But let's – can we talk, counsel, about the I.Y. Chen problem here, which is that when I read the I.J.'s opinion, the I.J. block quotes very specifically one report where Mexico is to be applauded for its advances in legislation, but that very report on the very page that that block quote comes from also notes that 250 LGBT individuals between 2010 and 2013, as well as LGBT defenders, were murdered. And it is, you know, self-evident from the report that it was because of their status. That's in the one report. Then there are many other reports that the Petitioner had included that the I.J. makes passing reference to, but in no way, as I.Y. Chen compels, gives us any rationale for why the I.J. elevated that one paragraph over all the other evidence. Why is reversal and remand not compelled under I.Y. Chen? I'm not familiar with I.Y. Chen since that issue was not raised by my opponent in her opening brief. I didn't read her specific response. Okay, I'll give you sort of the skinny on it. It's the cherry-picking case. So it's the one in which this court determined that the I.J.'s failure to look at the 2009 report on forced sterilization in China in favor of the 2007 report was a deficient record, that the I.J. has to do more and explain why the I.J. is crediting or elevating one piece of evidence over another. And we reversed and remanded on that principle. Thank you, Your Honor. Given that, why is the same result not compelled? This goes to the second issue, a well-founded fear in the absence of any past persecution or any evidence of individualized risk. So what Petitioner has to show here is a pattern or practice claim. And under this court's precedent, Yong Hao Chen, this requires an egregious degree of risk to all members of the group. The case states that the key for the applicant is to show the thorough or systematic nature of the persecution he fears. So what the immigration judge did was look at the totality of the evidence. And that's stated in the immigration judge's decision. What are the specific instances that are raised, leaving aside what we cannot look at? What are the specific instances to which Petitioner was subjected that formed the basis for his argument about an objectively, a well-founded fear of future persecution? Because he has to show a well-founded fear of future persecution with sufficient evidence to demonstrate a reasonable fear of being singled out individually, as I understand it, for persecution on account of his homosexuality. That's one way to establish a well-founded fear claim. And the other is the pattern of practice. Right. And in this instance, it's sort of a sliding scale. The more individualized risk you can show, such as Yong Hao Chen provides a list of examples of what individualized risk would look like. Maybe there's a judicial summons waiting for you in your country or specific people who are waiting for you. There's no such individualized risk here. So the only thing left is for Petitioner to show that all people in his group face the requisite level of risk. And here, looking at the totality of the circumstances, the record doesn't compel that conclusion. Even the articles submitted by Petitioner to the immigration court that describe a backlash, an increased risk of violence, actually paint a much more nuanced, complex picture. Can I stop you for a minute on that? With respect to the IJ's opinion, isn't the opinion somewhat internally contradictory in that the IJ, at page six of the opinion, actually references the voluminous articles to find that the Petitioner was credible?  So the evidence that then, at a later part of the opinion, is jettisoned is the very evidence that the IJ uses to say, this individual has an incredible fear of future prosecution, albeit subjectively. Isn't that then inconsistent with saying later, objectively, this evidence doesn't pass muster? It's not, Your Honor. The immigration judge is recognizing that there is offensive conduct regularly committed in Mexico, there is discrimination, and these things are in the record. But the record does not compel that there's such a systematic, thorough degree of persecution to create a pattern or practice claim. You don't think the claim that 288 LGBTI individuals were murdered in Mexico between 2010 and 2013 is something more than offensive conduct? No, those individuals were definitely subjected to persecution. They were killed. But it doesn't mean necessarily that there is such a degree of risk for every person. This is one snippet from this whole record of reports and the like that the Petitioner, in this case, presented before the IJ. The IJ simply refused to grapple with that evidence. And as my colleagues have indicated, elected to cherry-pick those portions of the report which favored his ultimate conclusion. That's problematic. And on top of that, I mentioned to your colleague that he completely misrepresented the report, quoted language that he claimed supported his position, which didn't exist at all. I just find this very, very troubling. The immigration judge discussed the evidence both for and against Petitioner's case for an entire page on page 10. And then at the top of page 11 of its decisions, record AR-56, found that considering the totality of the evidence on both sides doesn't add up to a well- So what do you say about this mountain of evidence in the form of reports from Petitioner? How did he grapple with that? I don't know how the immigration judge considered that exact piece of evidence, but typically it's presumed that an adjudicator considers the evidence when they say they have and reaching their conclusion. But the immigration judge isn't required to look at each document in the record and address it specifically. But the IJ, I don't think there's any support, can actually mischaracterize the evidence. I mean, my colleague has a great point. On page 10, which you point us to, the IJ said, Respondent proffered evidence that both private parties and the police harass homosexual persons in Mexico and then cite to the entire record, including those reports that talk about outright murder, fire bombings in gay rights events. It's not harassment. He just acknowledged it's not harassment. How is that treating the evidence? I think it's helpful to actually look at the evidence itself, Your Honor. There's an excellent example at record page 436 to 441. This is a document that Petitioner submitted below entitled, Mexico's LGBT community faces violence despite major gains in civil rights. And this article goes into depth about statistics, the rising murder rate that Judge Diaz cited, the backlash from the legislative improvements. But it also paints a contrasting, very positive picture of Mexican conditions for members of this community. It states that the raids that used to happen in gay nightclubs, the teasing and beatings have stopped as a result of police training. It's been very effective, is what the article states. It states that many supporters of the legal changes say that the real victory is a revolution in social norms. And in many places, this social revolution has already happened. The difficulty that I am having here, even as we parse this, is our standard of review. By statute, by statute, we are statutorily obligated to affirm the board's factual findings unless any reasonable adjudicator would be compelled to conclude to the contrary. That's correct, Your Honor. So it's not even a question of whether we disagree. It's whether the record compels us to conclude that the IJ was wrong. And that's a pretty daunting standard, whether we agree with the IJ or not. Right. It is a very differential standard, Your Honor. And I don't believe this record compels a conclusion that every homosexual man in Mexico has a well-founded fear of persecution, of facing harm that rises to that level of severity. It may be that there's significant amount of discrimination facing the average person, but the average person might not face murder or other forms of persecution that are sufficiently severe. But would you agree that the arguments you're making to us right now, which are very cogent, very well-reasoned, are not in the IJ's opinion? And the only alternative way that this goes back to the IJ is under IWATCHN, where if we find that the IJ just simply did not engage in any reasoned analysis when looking at competing pieces of evidence, if we find that there really was no rationale behind it, then IWATCHN compels we must remand so that the BIA and the IJ can offer, quote, a specific cogent reason for rejecting evidence, whether testimonial or documentary, because it lacks credibility. So in other words, the very balancing act you've just done today, if we find the IJ hasn't done it, then we have to send it back. Would you agree with that? I would agree with that, but I would also argue that the IJ did do that at the top of page 11, where it said that it was considering the totality of the evidence and found the petitioner's harm is speculative at best, considering the degree of risk that he faces. The IJ stated that the future harm is not objectively reasonable because it lacks solid support in the record and is merely speculative at best, and that there's no concrete specific facts to conclude that petitioner's harm is, his subjective fear of future harm is subjectively reasonable. So under your view of this record, it's not that the IJ overlooked or ignored the evidence. He simply came to a conclusion that notwithstanding these, what I view to be a mountain of reports that suggest very troubling conditions on the ground in Mexico, that that just wasn't enough in this case. And if we send it back, the result's not going to be any different. That's my argument, Your Honor. And there certainly are people who face serious risk of harm in Mexico. Mexico City is also a huge city of over 21 million people. So I'm not sure that saying 200 people are murdered over the course of a decade is sufficient to say that every person who is in Mexico faces that level. Well, I mean, that was just the more extreme definition. I mean, there's a lot more in these reports than just that. You would concede that, wouldn't you? Yes, Your Honor. But I would also argue that the majority, the primary risk the petitioner would face would be discrimination and not harm rising to the level of persecution. I'm sorry. Asylum, though, is different from CAT, as I recall, in that asylum doesn't require action by the government, does it? That's right, Your Honor. Asylum does require to show past persecution that the government is unable or unwilling to protect. Or unwilling to, but not, yeah, but not acquiescent necessarily. But there was no finding by the agency in this case that the government would be able to do that. And that was the issue in Bringus-Rodriguez, the case discussed earlier, where the Ninth Circuit criticized the agency for over-relying on the State Department reports, stating that, you know, emphasizing the legislative changes. That's a different issue in the case before us here. We're not concerned about whether or not the government would protect the petitioner. In Bringus-Rodriguez, there was past persecution demonstrated. There was a well-founded fear. And the only issue remaining was whether the local police would protect. Here, we haven't even gotten to that stage. We're still demonstrating, trying to demonstrate just a general pattern or practice claim. And the legislative enactments is just one piece of evidence in the total characterization of Mexican society that goes to demonstrating whether or not there's a pattern or practice of persecution. So do you agree with the holding in Bringus-Rodriguez? I don't have any particular reason under this case to challenge that holding. I think it makes sense that you shouldn't overemphasize legislative changes and ignore evidence that local police in Mr. Bringus-Rodriguez's case would not help him. Here, we don't even get to that stage because there's no evidence that Mr. Mendoza has experienced past persecution or that local police are unlikely to help him if he does experience harm rising to that severity level. I mean, we can't apply the presumption, I guess, if we can't consider the claim of past persecution. But that doesn't mean that he hasn't presented any evidence of that. I thought he did. He presented evidence of harassment on the street but not harm rising to the level of past persecution. In Bringus-Rodriguez, the person was subjected to severe sexual abuse and rape over a period of time. Facts that are not present in this case, Your Honor. I thought this petitioner recounted some instances of prior sexual abuse when he was a child. When he was testifying to the asylum officer in his credible fear interview, he mentioned some sexual abuse by a caregiver in Mexico, but that evidence was not incorporated into the immigration court's record. The petitioner did not testify at his hearing. He simply incorporated the declaration that he submitted to the immigration judge, which does not discuss childhood abuse but focuses his claim on the adult street harassment that he faced. Let me read a quote to you from the Ninth Circuit's decision in Bringus-Rodriguez and ask whether or not you agree with it. In part, the court said, it's well recognized that a country's laws are not always reflective of actual country conditions and that it's not unusual that a country's du jour commitments to LGBTI protections do not align with the de facto reality of whether the state is able and willing to provide protection. Do you agree with that statement? I do, Your Honor, and that goes to the issue of whether the state is unable or unwilling to protect, which was the specific issue in Bringus-Rodriguez, which is not an issue in this case. Again, I thought the petitioner presented evidence of the lack of interest and, in fact, disdain of state officials, police officers and the like to protect gay men and women in Mexico City and elsewhere. It did. The agency, though, did not make a finding. Well, in fairness, it presented evidence of specific instances in which the police expressed disinterest. But on the pattern and practice front, it presented evidence that the police are being required to undergo training to address those instances of behavior. So there was evidence of these individual instances and then there was the evidence of the police department's response. Correct. It's somewhat confusing that the laws in Mexico are being used in Bringus-Rodriguez to address the factual issue of whether the government is unable or willing to protect. And in this case, those same country conditions are being used to address a different issue of whether or not there's a pattern or practice of persecution. So it's an interesting comparison, but not directly on point. Here we're looking at everything about Mexican society. The laws that presumably were created by Mexican citizens and reflective of some portion of society compared to what the police may or may not be willing to do in the event he does face harm rising to the level of sufficient persecution. In sum, this record does not compel the conclusion that Mendoza has established a pattern or practice of persecution, that there's such a thorough or systematic persecution on the ground in Mexico such that he's established a well-founded fear. Thank you. Just very briefly, I would like to... I'm sorry. I'm sorry. Go ahead. Whatever you want to then come up. I want to make sure we're talking about the same instances to which Mendoza was subjected as an adult. The group of men chased him and his boyfriend into a subway station calling them names. Yes, that's right. The police searched him roughly after seeing him with his boyfriend without explanation. Right. And I think roughly, you know, the language was pretty clear that this was direct harassment. I don't disagree with that and I'm not trying... I don't mean anything by... I understand. ...by what I'm saying by way of a description. And that people in a car yelled obscenities and one of them threw a bottle that hit him in the neck. Right. And that the police's response specifically in that instance was he shouldn't act gay. Yeah. Or negative. As I was going to say, the police response was unhelpful or negative. That's correct, Your Honor. Are there other instances affecting Mr. Mendoza? Well, I disagree with the... But I didn't make the... ...about the child abuse. I'm asking... Okay. I believe that the child abuse is part of the record, Your Honor. It was the credible fear interview was admitted as evidence by the judge. It's in the administrative record 506 at SAC. It was unobjected to. There was no cross-examination on it. There was no objection whatsoever. The declaration of the petitioner submitted to the court, AR-255, specifically states that it is supplementing the statement made during the CFI. Did you argue the childhood abuse as evidence of past prosecution before the BIA? I did, Your Honor. Did you raise it before the BIA, Ms. Korsunen? It is. It's in our board's decision. It was made in my trial brief at administrative record 235. It was argued. And it was also, in addition, it was incorporated by reference into the I-589, which is the application for asylum at AR-493. So, you know, to say that we didn't raise it... Was he also subjected to abuse by his landlord in a separate incident? I think it was his landlady on AR-258, he said, shouted obscenities at him when there was some dispute, unrelated dispute, I would say. I'm not sure what it was, but the AR-258. He makes reference to his coworkers, referring to him as a fairy, and using derogatory terms. So there are accumulation of incidents over time. Did it rise to the level of persecution in your assessment? You know, it's... I think what... My point is more that these go to reinforcing my client's well-founded fear of future persecution, which, you know, according to Crespin-Valladere, it only needs to be a 10%. This is not an... You know, it's not a high barrier that my client needs to cross. But, you know, for the judge to say that the objective evidence supports my client's subjective fear, but that the objective evidence does not support an objective fear, to me is baffling. Well, no, it's... Actually, it just reflects the difference between a subjective assessment and an objective one. I can subjectively feel that I don't make nearly enough money, but the government feels, objectively speaking, that I do. There's no inconsistency there. It's just a difference in perspective. But the objective reasonableness is a reasonable person... Now, would a reasonable person in this instance, you know, the mythical reasonable person, fear future persecution, and would that persecution be more than 10% likely? And then that just gives rise to the question about the difference between harassment and persecution as a pattern. And the problem that I have to keep going back to here is our standard of review, which, as you say, is daunting. But I certainly take your point, and it's a very troubling set of facts. You know, it may be... It is a high standard, but it's not an insurmountable standard, and this Court has found on many occasions that a judge's failure to conduct a thorough review of the evidence is sufficient to, you know, pass that standard. Ms. Parsons, what, in your view, would be the remedy in this case if we agreed with you? Is it appropriate or even necessary to send the case back to the IJ in light of the suggestion that perhaps... with directions that he more fulsomely discussed the evidence as opposed to cherry-picking parts of the record? Or is this a record that, in your view, compels only one conclusion? I know that in Ai Hua Chen the Court did remand because, you know, for a full review of the evidence. I'm not sure that that is necessary in this case. There is a very, very complete record of evidence, which I have argued compels a different outcome. Obviously, remand is an option before this Court, but my position is it's not necessary. And I see I'm out of time again. Thank you very much. Thank you very much.
judges: Allyson K. Duncan, Albert Diaz, Paula Xinis